1-819-5-2 United States versus Humberto Lopez-Delgado Good morning, may it please the court, Andrew McCutcheon on behalf of the defendant appellant Humberto Lopez-Delgado, I'd like to reserve two minutes for rebuttal, please. You may. Thank you, Your Honor. The district court in this case committed a series of procedural errors in fashioning a 96-month sentence, a 50-month upward variance from the appropriate guideline range, for a 22-year-old man with cognitive defects, a horrific childhood, and a criminal history score of zero. First, the district court made clearly erroneous factual determinations relating to the cause, onset, and form of Mr. Lopez's mental illness and interpreting the statements of an evaluating psychologist regarding Mr. Lopez's quote-unquote dangerousness. Second, the lower court categorically rejected Mr. Lopez's childhood trauma as a mitigating factor, the true driver of his mental illness and drug use. Third, the district court failed to adequately consider the need for mental health treatment and the most effective manner to implement said treatment. Fourth, the district court failed to reasonably justify the extent of the 50-month upward variance from the properly calculated guideline range. Finally, the district court also committed substantive error, failing to properly consider Mr. Lopez's horrific life, mental illness, and drug addiction, instead focusing solely on deterrence, retribution, and isolated portions of a psychological evaluation. Turning to that first issue, during the sentencing hearing, the district court unequivocally concluded that Mr. Lopez's quote has a mental health record stemming from his substance abuse history. That is simply incorrect. Mr. Lopez's mental illness began when he was eight years old. He was referred by a school counselor for mental health treatment. He was diagnosed with ADHD. He was medicated. He was sent to therapy. When he moved to New York, he continued receiving therapy. He was homeless. And by that time, he had received a diagnosis of ADHD and bipolar disorder. Counsel, maybe that phrasing is not ideal, but it seems to me if you look fairly at some of the colloquies between the judge and Dr. Mendez, the judge seems to be aware that childhood trauma can contribute to some of the psychological disorders that the doctor is now testifying to. So for you to say that, again, I understand why you rely on that phrasing, but if you look at the totality of the sentencing, I think it's pretty hard to argue that the judge did not understand that that horrible childhood of the defendant did not play a role in his mental illness. He understood it wasn't just the drug abuse that made him mentally ill, that there were precursors to it from his childhood. Aren't you taking an unduly narrow view of the sentencing record? Your Honor, I think the district court's statements indicate his belief regarding the narrative of the case, which was simply at the end of the day that this was a bad apple. Somebody whose problems were of his own making because of his drug abuse, that led to mental illness, and the mental illness combined with the drug abuse led to his problems and his federal conviction. I think that's clear from the statements made over and over again. That's not a procedural error. I'm sorry, Judge? That ultimate conclusion, are you saying, is clearly erroneous? I'm saying that the drug – Because one version of your argument, which is a coherent argument, and I'm just trying to understand whether it's supportable, is there was a procedural error because the judge mistakenly concluded that there was no mental health record stemming from anything other than his drug abuse. Correct. That, I think, as Judge Lopez was suggesting, is somewhat hard to square with the record, because even the phrase, he has a mental health record stemming from drug abuse, needn't be read to say, and he has no other mental health record. He certainly does have a mental health record stemming from drug abuse because he was treated for it, and there are records coming from that. And that if you look at the colloquies, it's evident that the district court was aware of his other psychological problems that predated the drug abuse. So I'm not quite following that point. Judge, I would respectfully disagree that he was aware that the driver of the drug use was the mental illness that he was suffering from. I didn't say that. I just said the judgment as to what ultimately drove the behavior here is one the district court made. You could contest that, considering all the evidence, and say he made a wrong judgment. But you seem to be making a different point, which is that he mischaracterized the record in reaching that judgment by saying that, unless I'm misunderstanding your argument, but when you focus on that phrase, stemming from, you seem to be saying that the problem with the district court procedurally erred by mischaracterizing the record. I think that in his mind, Mr. Lopez was not suffering from severe mental illness before he started using drugs. That was my understanding of his arguments during the sentencing hearing, Judge. And that's incorrect because we have the 2010 documents from Four Winds, which is a mental health institution in New York. So what is the basis for concluding that the district court didn't believe that there were mental health problems prior to the drug use, but that ultimately the behavior for which he was being sentenced stemmed from mental health problems relating to the drug use? I don't think he once mentioned mental health problems before the drug use. He also said the hospitalizations stemmed from the drug use. So never once did he mention the mental illness and the hospitalizations that occurred before the drug use. So are you saying that the judge clearly erred in his factual finding? Yes, Judge. I'm saying he clearly erred and made erroneous factual determinations relating to the cause, onset, and form of the mental illness. So for him, the mental illness didn't particularly exist before the drug use started. That's a different characterization of the error than whether he concludes that the ultimate behavior for which he was being sentenced was attributable to mental health problems relating to drug use, from stating that the district court was of the view that he had never had any other mental health problems prior to the drug use? Frankly, both, Judge. Well, on the first one, what is the basis for concluding that the district court took the view that the only mental health problems that he had related to drug use? Again, his statements during the hearing and the fact that- What is the statement? If the statement that you rely on is he had a mental health record stemming from drug abuse, I don't see how that is a statement that he had no mental health problem unrelated to drug use. And my response would be, and not once during the hearing, Judge, did he ever mention a mental health record before that. But that was all put before him that he considered. I don't know if he considered it. Frankly, I don't believe he did because I don't think that was consistent with the narrative that he wanted to advance during the sentencing hearing. I don't disagree that the records were before him, though. Correct, absolutely. And that's part of the problem. As part of the PSR and the sentencing memorandum, the defense submitted- Was there any statement by him that I considered the record as a whole? He considered the 3553A factors. I don't believe he said that he considered the entirety of the mental health record of Mr. Lopez, specifically with regard to- But he said, I've seen all your submissions or something like that? I don't know, to be honest, Your Honor. Doesn't the PSR reflect his early treatment? Absolutely, Judge, and I think that's part of the problem. Doesn't he say he would have ignored the PSR? Yes, that's correct, Judge. I see my time is up, Your Honor. I just want to go to the second part of it. Sure. Part one, if I understood it, was the error was that he didn't acknowledge that there was any mental health problem prior to the drug use. That's correct. We just discussed that. Yes, Your Honor. But you say there was a second error, and I'm not entirely sure whether I picked this up from your brief, but assuming it's in there, the second error would be even though he was aware that there were mental health problems prior to the drug use, he concluded that the mental health problems that led to the conduct for which he's being sentenced stem from the drug use. And you say that's clearly erroneous on this record? I would say that the mental health problems were exacerbated by the drug use, but if you don't believe that the mental illness existed before the ‑‑ Okay, so it's the same argument. It's the same argument, Judge. Okay, I got it. It's the same argument, but they go hand in hand together. That was the root driver of the behavior. The trauma led to mental illness, which led to drug abuse. I guess what I'm saying, suppose the district court said, I understand he had mental health problems prior to the drug use. I understand you're telling me that's the root cause. I disagree with that. I think the ultimate cause of the behavior for which I'm sentencing him, notwithstanding his prior mental health problems, was the drug use. Would that be clearly erroneous, that finding? I think so, because then you wouldn't be appreciating the severity and the involvement of the mental health issues in the commission of the offense. You would simply be concluding that this was somebody who was irrational and behaving in that manner because of other issues, not because he had mental illness and mental illness led to drug abuse. Were there experts that were put forward at sentencing to testify to that fact, that there's no way to disentangle them and be against all medical understandings to disentangle them the way the judge seemed to be disentangling them? The expert that testified said that trauma can be the driver of mental illness. Can be. Can be, correct. Must be? Must be, no. He didn't obviously have an MRI or cognitive testing, something to that extent. However, it was clear from his testimony that ACEs, which are adverse childhood situations, frequently cause cognitive deficits, neuropsychological deficits, and that's obviously something that Mr. Lopez was suffering from, and that's something that the expert did testify to during the sentencing hearing, that it was apparent from his testing that Mr. Lopez suffered from all these deficits.  Just another question, counsel. Yes, sir. I guess I ask this in part, I'd like to know your answer, but I think it's important for the government to know what your answer is. The law is pretty clear that the trial judge cannot prolong a period of incarceration for some sort of rehabilitation purpose. There's a fair amount of case law on that. There is the suggestion, I think it's more than a suggestion, that the district court, in emphasizing that he wants your client to be in a prison hospital throughout the duration of his sentence, that he seems to take the view that the longer he is in prison, the longer that he is getting mental health treatment, that will be good for him and good for society. And to some extent, that arguably might drive this highly variant sentence. But I don't know that you're making that argument that, unless it's somehow incorporated in your substantive and reasonableness argument, that the court inappropriately lengthened his sentence to serve some rehabilitation purpose. You're not making that argument, I gather? My brief did not contain a tapia argument. I think that's what the court's after. It didn't make a tapia argument. For us, the statement regarding the medical institution, the medical hospital, was simply lip service that the court was paying to this supposed need for treatment. Because at the end of the day, I don't think that he was focused. My argument was that the district court was not focused on mental health treatment for Mr. Lopez in the most effective manner to implement that treatment. That was the argument made in the brief. And simply designating a medical hospital is not enough to adhere to 3553A2D's pronouncement, being that he needs to consider in totality why a prison hospital would be the quote-unquote most effective manner to implement the treatment that he needs. And the fact of the matter is that Mr. Lopez is now in Jessup, Georgia, a medium security prison institution. It's not a medical facility. There's four psychologists for, I think, slightly under 2,000 inmates. So the notion that he's receiving mental health treatment in an effective manner is high fantasy. And that was something that the defense wanted to get out during the sentencing hearing. Why can we not incarcerate Mr. Lopez? You know, what's the treatment that he needs? Why may that treatment not occur in a prison setting? And those were all the things that the district court prevented defense counsel from asking during the sentencing hearing. And that's why there's a 3553A2D violation here, and the sentence ultimately imposes procedurally improper as well. Just so I'm clear, the thrust of it then is that the sentence should be lower, essentially for mitigation reasons, right? Correct. And for treatment purposes. I mean, the fact that any treatment should occur outside an incarcerated setting. Okay. So in support of that argument, one argument you make has to do with the district court's supposed error in accounting for the evidence in the record of his pre-drug use mental health problem. Yes, sir. Anything else? That contributed to the error regarding? What other, if we were to say that ground failed, is there any other ground, what are the other grounds that you identify in which the district court erred? Sure. So he also rejected the idea that Mr. Lopez suffers from either bipolar disorder or a mood-related disorder. And that was in the information that was submitted by defense counsel as well. Instead, he focused solely on statements made by Dr. Mendez, who was the expert that testified during the hearing, who also had not reviewed in its entirety Mr. Lopez's mental health history, including the documents submitted as part of the sentence. This is the treating physician argument that you made? This is the treating physician argument, correct, Judge. Obviously, somebody who's been treating Mr. Lopez for months and months and months, including at an inpatient facility where he's receiving a treatment of all kinds, recreational therapy, occupational therapy. And what was the district court's reason for not concluding that the treating physician's analysis was correct? There was none on the record. What he said was that a bipolar diagnosis is simply something that psychiatrists do because it's the easiest thing to do. And that was basically the reason that he gave for rejecting that voluminous analysis. Counsel, on this treating physician point, the case that you cite, the treatment there took place over a matter of years. What you characterize as treatment here seems like it was more like an evaluation. It was very, very short term. Isn't that correct? It was nothing comparable to the case that you cite. It was a one-month inpatient treatment program. Okay. And then there was also a number of other records submitted from other facilities that also reached bipolar diagnosis conclusions or mood disorder diagnosis conclusions. And I would note also that the BOP evaluation that occurred here reached a conclusion of other specified mood disorder and other psychiatric or psychotic disorder. And then it also stated that Mr. Lopez's psychiatric, I'm trying to think of the exact word, his psychiatric future, it was in all likelihood he had a favorable future in front of him on the psychiatric front. It was something that he could be treated for successfully with medication, therapy, things of that nature. That was in the BOP evaluation that occurred in this case as well. So I think the district court didn't consider any of that. The fact that he suffered potentially from mood disorder or bipolar disorder and the fact that it was something that was potentially treatable as well. I think the district court also used these prior errors and isolated portions of Dr. Mendez's testimony to conclude that Mr. Lopez was, quote, unquote, a menace to society. That's not what happened. What Dr. Lopez testified to was that there was a high chance of recidivism. He did use the word dangerous, but it was in this recidivism context. He said that Mr. Lopez has difficulty understanding societal norms, things of that nature. But that's true generally of any youthful offender that's charged with a firearm offense. The risk of recidivism is high, and it doesn't take Mr. Lopez outside the mainstream of defendants that appear before the district court. The district court said in 12 years he had never heard an expert testify so explicitly that this individual is a danger to society. And that was not a throwaway line for the expert. I mean, he went into great detail as to why he thought he was a danger to society, starting with his childhood and all this defiant oppositional behavior. I mean, he recounts all of that in great detail. So this is not just there's always some danger of recidivism. He very much particularized why he used that characterization here. So I think to suggest that somehow the district court got it wrong, given the way that the testimony came in, strikes me as a pretty hard case to make. You know, got it wrong in the sense that he put so much emphasis on how dangerous the expert thought that this defendant was to society. I mean, there was a lot of testimony explaining why the expert said what he said. My response would be, Judge, there's no dangerous test that's administered. There's no dangerous meter that exists in a psychiatric test that Dr. Lopez administered. What he can do is he can look at some of the statements made by Mr. Lopez regarding some of the behavior that he engaged in in the past, and then say, well, you know, he thinks that he was behaving normally. But what was also included in that questioning was a statement that Mr. Lopez understands what he did was wrong and knows that now is the time where he essentially needs to pay for his mistakes that he made, understanding that his behavior is unacceptable. So I think that undercuts the notion that Mr. Lopez believed that he was doing things right and wanted to engage in this type of behavior in the future. And that was really the basis for Dr. Mendez's conclusion. I mean, there was no other test that he administered other than one relating to risk of recidivism that applied specifically to the dangerousness conclusion. It was just his overall understanding of some of the things that Mr. Lopez liked to engage in in the past. But, again, that in conjunction with one test relating to risk of recidivism doesn't take Mr. Lopez outside the mainstream of defendants that appear on 922G, 922O cases in front of the district court. And that's exactly what the district court said. Because of this statement made by the expert, this was not a case that was in the mainstream of 922G, 922O cases that the court has heard. And I simply don't think that's true based upon only the information in the expert's report and the risk of recidivism, which is actually lower than that found in… Was anyone asking for a variance? I'm sorry? Did the government ask for a variance here? They asked for an upward variance. They did? Yes, Your Honor. The defense asked for a within-guideline range sentence. Unless the court has any further questions. Thank you. Good morning, Your Honors. May it please the court, Julia Magonetes for the government. The district court did not abuse its discretion, much less plainly err, in imposing an upward variance sentence. Now, the two claims that Brother Counsel focused on in his oral argument were unpreserved claims of error. That's to say, at the sentencing hearing, after all of the evidence was in, after Dr. Mendez's conclusions were part of the PSR and he was brought as a government witness, there never was an objection to a fact-finding as to whether he had anti-personality, whether he had the antisocial personality disorder, or to whether, getting to the explanation of the sentence, the district court made a clearly erroneous finding relating to the onset form of his mental illness. Now, this is important because the failure of that objection would have, means that it's forfeited and would have triggered plain error review. On appeal, appellants… procedural and substantive objection without specifying? The objections that were made were procedural and substantive, and the specific procedural objection that was made was the balancing of the 3553A factors and the consideration of what it considered irrelevant testimony regarding the admission of the defendant after he was arrested when he said, I shot and killed Sika, which was an individual at the housing project. So those two claims were clearly preserved, and it's the government's position that that would have triggered abusive discretion review for those two claims. However, the general procedural objection, especially when dealing with fact-finding, was not made. And as a result, that claim was forfeited, triggering plain error review. The problem is that on appeal, that plain error standard was not acknowledged, and it is an appellant-heavy burden where they have to fulfill the four prongs of plain error. And this court in United States v. Pavon stated that ignoring the four prongs of plain error can amount to a waiver. So the government's first line of attack is that these arguments have been waived by failure to properly brief them under the plain error standard. In any event, there is no plain error in the district's courts recognizing his mental health problems or accepting the ultimate diagnosis of Dr. Mendez that he had antisocial personality disorder and that he was a danger to society. When we look here, when you look after what the court did when it calculated the guideline range, it began exploring the Section 3553A factors. It talked about the gun. It talked about his history. It talked about his past. It talked about his traumatic childhood, the fact that his father raped the sister. All of that is in there. And then it says he has a mental health history stemming from drug uses, including hospitalizations. What's important is at that point, nobody objected, which shows that it's an artful phrasing as opposed to thinking there was no type of mental health history. Can you just explain the variance? The variance has to be based on the conduct? Yes, Your Honor. And the conduct here does justify that upward variance. Why? Because we have an individual. We have him possessing a machine gun. And the district court, as this court says in United States v. Martin, upward variances usually have to go to the offense conduct and the history and characteristics of the defendant. So we have an individual who is possessing a machine gun. This individual stated, and the district court only used it for the fact that he stated it, that I've gotten in gunfights before. I shot Sika. He thought he killed him. He didn't. But I shot Sika. So not only did he say that, but he also said that to Dr. Mendez and other health providers, that he's engaged in gunfights in the past. So you have an individual who not only has a machine gun in Puerto Rico, which this court is well aware of, the rampant firearm violence, who is living in the housing project and said that he knows the underbelly of the housing projects. He knows where to get it, how much to pay for it, how to change a regular Glock into a machine gun. This is an individual who it's not just okay I have a gun. It's I have a gun and I use it when I feel bullied, when I feel that my integrity is at stake. This statement that he killed Sika, there was testimony that the defendant was very, very high when he was arrested. Isn't that true? That he had ingested a large amount of marijuana at the time that he was arrested. There is evidence to that effect in the record. Is there not? Your Honor, the evidence is that he admitted to smoking 30 joints a day. I am not sure that he admitted that I smoked 30 joints today. Well, the statement that he killed Sika, is that, and the judge did focus on that for sure. I mean, what do we know about that incident other than the defendant, in what appears to be a somewhat hallucinatory state, or at least he's very much under the influence of drugs, claims to have killed Sika. Is there any, was any attempt made to, that's a serious thing, I killed somebody. Was there any attempt made to find out if there's any factual basis for that? Yes, Your Honor, there was. And if I may explain, we do not agree that the district court used that to heighten the sentence. It was more of a... Well, he referred to it, did he not? He did refer to it, and when he referred to it, when the first, the objection to the testimony coming in of the law enforcement officer, the district court said, it's coming in for the fact that he said it. He never said that I'm going to consider that he did it. But what's important is that it was reliable. Well, why would he cite it if he doesn't use it? But it showed because it was reliable at that point. The government put in evidence that an individual at the Llorenz Torres Housing Project was where he lived, and it was conceded by counsel that's where he lived and where he was arrested at the time of this current offense, that there was an individual who was named Sika who was shot and who was injured. And he had told this individual that Sika was part of the drug trade and that he would hurt him, that he was a bully, that he would pistol whip him, and that he had some sort of a beef with him and that he killed him. When the law enforcement individual then told him, Sika's not dead, he was injured, and there was someone who testified to the fact that he visited Sika in Centro Medico, the hospital, he started to cry. Presumably, maybe he was fearing retribution for that type of behavior. But it's important to the extent, and it's relevant under just like Section 3661, it's relevant in the sentencing calculus because it shows the type of person who will readily use a firearm if need be. And he had this potent firearm which is capable of killing many people within seconds in two extended magazines. I think the point Judge Lopez is trying to make is that was there some effort to corroborate it because the Judge Dick seemed to take it under consideration. Yes, Your Honor. There was effort to corroborate it to the extent that there was two individuals who testified, and the second individual was the one who interviewed this man, Sika, in the hospital. And through hearsay testimony, because it actually is in the record, but that it was sustained by the government. Did Sika say that this defendant shot him? He said that Humberto Gringo shot him, and Mr. Lopez's alias is Gringo. That was sustained as hearsay. The government argued that at a sentencing hearing, hearsay is permissible, but nonetheless, the same court sustained it. And at that point, he even said, all we have here that's important for sentencing purposes is that he said so, not that he did it. The court said that at sentencing. So it's not relying on that. So not that he did it, but that he said it. So that is in the record, and it's specifically at page 26 of the sentencing hearing. So to think that the court said that. And that's – I'm just trying to figure – for purposes of the variance, what is the significance in your mind of the fact that he said it as a justification for a variance of this length? If you're accepting that it may not have been a true statement. Well, I'd be hard-pressed to think that this was the tail that was wagging the dog. When we look at the district court's explanation – Okay, so then what does justify the variance? The district court justifies the explanation by looking at the fact, and it specifies the seriousness of the offense in the terms of this machine gun that we modified. And is that – what would be the regular sentence for that? Well, the – Is it because the nature of the firearm already justifies a variance? Well, no, because presumably he pled guilty to being in possession of a machine gun. However, as this court has noted, in Puerto Rico you can take the community characteristics. Did he? Did the district court? No. So what justifies the – what did he rely on for the variance? If it's not the statement, if it's not the – He relied on, Your Honor, if I may, not only the dangerous assessment. So he relied on the history and characteristics of the individual. He noted – But that's what slightly troubles me, that if you have two defendants, one of whom – and maybe I'm wrong in this – you have one of whom who does X conduct, and you have another who does X conduct, but the second one, as a psychiatrist testified that he has a personality disorder, the second one gets a longer sentence just for that reason? No, Your Honor, because on the record as it stands, we have Dr. Mendes state that even if he didn't have antipersonality disorder, he would have found him to be a danger to society. That's on the record because it was asked. Based on what? That is what – it wasn't further asked by the defense at that point why that – what the purpose was, but it's on the record. And at this point – Is there anything that could support that statement? Well, we know that part of it could be the antisocial personality disorder. But then we're back to the reason he's getting a longer sentence is because he's got a mental illness. No, Your Honor, the district court didn't necessarily do it that way. It wanted to talk about just punishment. It wanted to talk about deterrence. It talked about promoting – Of what? Of what? It's got to be of the conduct, right? Of a dangerous individual who was in possession of a machine gun who knew a way around a dangerous area, who knew how to get guns made into machine guns, who admitted that the gun that he had – not that he used it, but the gun that he had had been previously used in murders – this is a dangerous situation by Dr. Mendes himself. And the fact that that evidence was on the record, unobjected, the district court could rely on it because when there is – And that's exactly what there was here. You had Dr. Mendes specifically state, and the district court noted it, that the most – that in his opinion, Lopez has minimal understanding of social mores and his convictions of the outside world, that following society's rules, laws, and community challenge is a challenge for him. And his views are tied to violence, drugs, loyalty to the subculture of drug and criminal behavior, and that he uses that to feel protected for himself. Taking that, noting that we need to provide just deterrence, protect the public, call into consideration the seriousness of the offense, the court weighed that and determined that an upwardly variant sentence was appropriate. Counsel, can I ask you about the judges repeating over and over again that this is in response to the arguments of defense counsel, the judge is not sufficiently appreciating the troubled mental history of the defendant. And the judge says, you're going to serve this time in a prison hospital. He says that over and over again as if to say, I'm not being insensitive to your mental health problems. They are going to be addressed in a prison hospital. Counsel, isn't defense counsel correct that there's no way in which a judge can dictate that someone that he sentences serves time in a prison hospital or gets a particular kind of treatment? That's entirely up to the Bureau of Prisons. That seems to be, counsel may not be far wrong in saying that's sort of paying lip service to a desire, but the judge can't control any of that. Isn't that true? Yes, Your Honor, it's true that they can. And what happens here bears that out, given what defense counsel has represented, that this individual is apparently receiving nothing in the way of mental health treatment. Well, Your Honor, that's unknown at this point. I wouldn't go so far as to say that. While it is true that the Bureau of Prisons makes the ultimate determination and a district court can recommend, the reason why the issue of a prison hospital was on the forefront was the resulting of counsel's own questioning to Dr. Mendez, saying that isn't jail not good for antisocial personalities? And at that point, Dr. Mendez said it may cause the condition, it might cause it to worsen. And so then clearly responding to that issue, which I think shows his need or shows at least the district court's concern with this rehabilitation of the individual, it asked whether a prison hospital would be the better option. Granted, he cannot force Bureau of Prisons' hand in doing that, but he makes the recommendation. We know currently that he may be in Jessup. We don't know if he's been there. We don't know what type of treatment he has had. But what's important to highlight is when he was in Miami for his competency evaluation, at that point the Miami evaluation noted that he was not having any treatment. And even after coming back from Miami, all of the evaluators, even the defense evaluators said that he was in the best position that he had been. And while they noted, and this is the Miami court, that his prognosis was mixed because he can benefit from it, he has to want to do it. That was the negative aspect of it. And here you have an individual who told Dr. Mendez that he likes being a bad boy. He doesn't want to change his life. And that's the difficult part here. But to say that he needed this treatment when he was in Miami, the doctors didn't say that he needed the treatment. They said that he could benefit from substance abuse treatment. They said that he could benefit from anger management and then mental health treatment. Those were the three steps that Dr. Mendez explained at the sentencing hearing. And now those are all programs that Bureau of Prisons, when evaluating him, because it was the district court who said that I recommend you go to a prison facility, be evaluated, and get the treatment he needed. He wasn't trying to supplant his own. The prior criminal history here is what? Is zero, Your Honor. So why does the judge, in justifying this variance, one of the reasons he cites is loyalty to a subculture of drug and criminal behavior. He has no prior criminal record. He has no prior criminal record, but his admissions to his various doctors, and he had an outstanding warrant, and he knew about it, for selling drugs when he was in New York. This is an individual who admitted to having a criminal past, even though his criminal history may not reflect it. And if there's no further questions. Thank you. The government made mention that Mr. Lopez wanted to be a bad boy. If we're using Dr. Mendez's report and the statements made in there, I think it's important to note what he actually said was he believes that his criminal record is on his favor and will not interfere with his goals because he knows what it is to be in jail. He states that, quote, my criminal record can help me, but I don't want to be a bad boy. And I know how this is, and I don't want to come back here, and I'm going to do things right. When questioned about this, he stated, I will stay tranquil and look for a job and don't come back here. So the notion that he doesn't want to buy into treatment is frankly hogwash. He did want to buy into treatment. He stated specifically during allocution that he was willing to accept and receive whatever sort of treatment the district court would offer. Unfortunately, it didn't offer anything. But I wanted to close by touching on substantive unreasonableness. At the end of the day, this was an individual whose father beat his mother on the days leading up to his birth. It was an individual whose father raped his sister during his formative years repeatedly. That led to a broken home. He then spent years homeless in New York, literally guarding the family belongings, while his mother stood in line at homeless shelters so that they could spend a single night off the streets. And this repeated itself over and over and over again, day after day. And that's the true driver of the mental illness and the drug abuse here. But if that doesn't move the needle one inch for the district court, it hasn't conducted an individualized sentence assessment required by Gaul and this Court's precedent. And that's exactly what transpired. I guess I'm just trying to – there's two aspects. Some of your argument sounds like an argument for why there should be a downward variance. But all you're challenging, if I understand it, is the upward variance. That's correct. So with respect to the upward variance, what I'm still not fully understanding is – maybe you have a view on it. What is the basis for the upward variance? And it sounds like the basis for the upward variance you're suggesting was an assessment of his mental health. Can that be a basis for an upward variance? I see my time's up. May I answer the Your Honor's question? I don't think that mental health alone can be a basis for an upward variance. Certainly, the court can consider everything under 3553A. If he is considering it, he needs to consider the entire picture and not selected portions. He needs to make accurate factual determinations, and he needs to weigh that with the other mitigation presented by the defense. But that's not what happened here. He focused solely on the nature of the firearm, some selected portions of Dr. Mendez's testimony. But counsel, what if he concludes that this individual, based on Dr. Mendez's testimony, is unusually, perhaps uniquely dangerous? I mean, that seems to be the thrust of Dr. Mendez's testimony, and that seemed to have had a great impact on the judge. Wouldn't that judgment that this defendant – this is not just an ordinary recidivist potential we're dealing with here. This is somebody who is particularly dangerous. Wouldn't that justify an upward variance? Well, to answer Your Honor's question, I think the district court would need to consider that statement in conjunction with the other mental health history that was presented before it, including those who had essentially treated him for months at a time, and not simply take that statement in a vacuum. Secondly, I think with regard to risk of recidivism, the court needs to understand that all young firearm-related defendants have a risk of recidivism, and we know that from the sentencing guidelines. So to say that this defendant was outside the mainstream as a result of that – I don't know if you're making this point exactly, but if the basis for concluding that a person is unusually dangerous is a mental health assessment of their personality disorder, not rooted in actual conduct by the person, is that a permissible basis for making a dangerous judgment that leads to a longer sentence? No, Your Honor. There needs to be some sort of rational basis to conclude he is a danger, and especially when the defendant is making statements like, I want to receive treatment, I want to receive whatever sort of help is available to me. That's the type of stuff that indicates somebody who will not present a danger in the future, somebody who will not recidivate, who is a – Does that answer change, though? I mean, the prosecutor is arguing that the defendant made certain admissions, so that there is, in fact, a factual basis for determining that he had engaged in criminal, albeit unprosecuted, criminal conduct in the past. I think we need to look at the context of those statements. This was a 22-year-old man who was obviously under the influence of large quantities of narcotics. He's handcuffed. He's in the room with multiple police officers. He has mental illness of some kind, and he's saying things that have no basis in fact, and that's consistent. But there was, in fact – I mean, was there, in fact, an outstanding warrant for a drug charge out of New York? There was a misdemeanor warrant for a drug charge which was subsequently dismissed. So I don't disagree that there is some fact mixed in, but I think it's also puffery, and that's consistent with Dr. Mendez's statement regarding how Mr. Lopez responds to threatening situations, and he says things to make himself appear strong when, in actuality, that's an attempt to avoid showing that he's weak, and that's consistent with the trauma that he's sustained in the past. So things of that nature. He also said that he smokes 30 joints a day. I don't think that's physically possible. He also referenced the firearm being related to murders. I don't know how he would know that when, actually, he was in New York at the time, supposedly, these murders transpired. So there's all kinds of factual inconsistencies with that statement, and it's not entitled to very much weight. I think, at the end of the day, it's unreliable. It's the product of that situation, his drug use, and his mental illness, and it shouldn't be given very much weight by the district court or this court for that matter. Thank you. Any other questions? Thank you.